Matthew R. Wojcik, ABA 0710071
E-mail:  matt.wojcik@bullivant.com
E. Pennock Gheen, *Pro Hac Vice*
E-mail:  penn.gheen@bullivant.com
Holly D. Brauchli, *Pro Hac Vice*
E-mail:  holly.brauchli@bullivant.com
Bullivant Houser Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington  98101-1397
Telephone: 206.292.8930
Facsimile: 206.386.5130

Timothy Petumenos, ABA 7611147
E-mail:  timp@tpaklaw.com
Law Office of Tim Petumenos, LLC
1227 W. 9th Ave., Suite 301
Anchorage, Alaska  99501
Telephone: 907-276-2676
Facsimile: 907-277-8235

Attorneys for Defendant

# UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| MICHAEL COLE, individually and on behalf of all others similarly situated,<br><br>                     Plaintiff,<br><br>      v.<br><br>GENE BY GENE, LTD., a Texas Limited Liability Company d/b/a FAMILY TREE DNA,<br><br>               Defendant. | Civil No.: 1:14-cv-00004-SLG<br><br>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
**Page 1 of 33**

# I. REQUEST FOR RELIEF

Defendant Gene by Gene respectfully requests that this Court grant summary judgment dismissal of Plaintiff's claims. This suit is based on a statute that is unconstitutional because it applies overly-harsh punitive damages and is so vague that Defendant cannot know what behavior properly complies with the statute. The statute also violates Alaska's law regarding punitive damages. Because of these flaws, and because Plaintiff does not allege actual harm, Plaintiff cannot establish damages and therefore cannot succeed on his claims.

# II. SUMMARY OF FACTS

## A. Family Tree DNA connects people.

Genealogy is the study of families and the tracing of their lineages through history.[1] The value of knowing the integration of a family's personal story into the fabric of history is one that has been recorded since the earliest stages of written history.[2] Alex Haley, when recording his own lineage through the roots of slavery back to Africa, stated:

> In all of us there is a hunger, marrow deep, to know our heritage - to know who we are and where we came from. Without this enriching knowledge, there is a hollow yearning. No matter what our attainments in life, there is still a vacuum, an emptiness, and the most disquieting loneliness.[3]

---

[1] Ronald Bishop, In the Grand Scheme of Things: An Exploration of the Meaning of Genealogical Research, Journal of Popular Culture 2008 41(3): 393–412.

[2] See Genesis 12: 1-20 (tracing familial generations of Shem); Matthew 1:1-17 (tracing the lineage of Jesus).

[3] See Willard, Terry and Willard, Jim, "Beginners' Questions Answered", Ancestry, Jan./Feb. 2006, p. 47.

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

The hobby of genealogy is well-documented in this country since its inception, although two major upticks occurred – the first after Mr. Haley's book was adapted to the TV miniseries, Roots, and a second after the internet became prevalent.[4]

Bennett Greenspan, the founder of Gene by Gene, felt the calling at the age of 12, and was "hooked."[5] This passion led to the founding of Gene by Gene. Mr. Greenspan had been corresponding with a family in Argentina and believed they might be related. He had heard about a genetic test involving the comparison of Y-DNA using STR's (Short Tandem Repeats). Because the paper trail he had been following to connect the lineage to the Argentinian family was incomplete, he believed this test might assist him in proving or disproving the connection. He reached out to a laboratory to see if he could arrange the test.[6] The laboratory informed him that it was unable to sell the tests to the general public, and also suggested that someone should start a company that would sell those tests publically.[7] Mr. Bennett decided to be that person and started that company in 2000.[8]

The company started in Mr. Bennett's home, with his cell phone as the company line.[9] Since then, approximately 800,000 people have tested using FTDNA's genealogical services.[10] Through the FTDNA website, thousands of people have reconnected with long-lost relatives.[11]

---

[4] Ronald Bishop, "In the Grand Scheme of Things: An Exploration of the Meaning of Genealogical Research," Journal of Popular Culture 2008 41(3): 393–412.

[5] Greenspan Decl., ¶4.

[6] Greenspan Decl., ¶3.

[7] Greenspan Decl., ¶3.

[8] Greenspan Decl., ¶3.

[9] Greenspan Decl., ¶4.

[10] Greenspan Decl., ¶4.

[11] Greenspan Decl., ¶8; Cloud Decl., ¶6.

Bullivant|Houser|Bailey PC

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Jewish families ripped apart during eras of persecution have been reunited.[12]  People who were adopted have found their biological families.[13]  Historical lineages have been identified.[14]  Emotional holes have been filled and repaired.[15] FTDNA has been a source of good in many people's lives.

**B.**  **FTDNA's Junk DNA tests are not medical tests.**

FTDNA – Gene by Gene's genealogical division – collects samples through cheek swab "kits" sent through the mail, and makes results available to the customer through an online account.[16]  The genetic tests are meant to supplement the paper trail of traditional methods of genealogy.[17]  Usually, the tests are run when the paper trail leads to a possible solution that needs to be confirmed.[18]  In the alternative, a genetic genealogy test may reveal the possibility of a potential relation that then needs to be confirmed by other means, such as historical documents.[19]  A simple example is the case of twins.  If identical twins submitted their DNA for testing, the high number of corresponding junk DNA values would mistakenly suggest that a parent-child relationship existed between the two subjects.[20]  Documentary evidence (in this case, two birth certificates indicating the same date of birth) would clarify the relationship.[21]  More often, FTDNA customers are looking at distant relationships that are less

---

[12] Greenspan Decl., ¶8; Cloud Decl., ¶6.

[13] Greenspan Decl., ¶8-9; Cloud Decl., ¶6.

[14] Greenspan Decl., ¶8-9; Cloud Decl., ¶6.

[15] Greenspan Decl., ¶8-9; Cloud Decl., ¶6.

[16] See Dkt. 95, p. 2.

[17] Greenspan Decl., ¶5.

[18] Greenspan Decl., ¶5.

[19] Greenspan Decl., ¶5.

[20] Greenspan Decl., ¶5.

[21] Greenspan Decl., ¶5.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
Page 4 of 33

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Case 1:14-cv-00004-SLG   Document 109   Filed 11/04/16   Page 4 of 33

genetically connected, such as fourth or fifth cousins, and are much more difficult to interpret.[22]

Unlike medical tests, which look for a particular "yes-no" answer establishing whether a genetic condition (established by exons) that affects human fitness exists, genetic genealogy tests are comprised of "junk DNA."[23] Consider the Y-STR test. In that test, short tandem repeats of non-exon DNA are compared.[24] While these specific Y-STR sequences do not contain information regarding one's genetic predisposition for disease, disorders, or any medical conditions, the markers tend to mirror those that derived from the same line of closely related humans.[25] A good way to think about this is to compare the Y-STR sequences to white noise.[26] White noise does not "say" anything in particular. However, people of the same genealogical history exhibit the same "type" of white noise, such as "static" versus "ocean waves."[27] Tests that rely on analysis of this "white noise" are based on "non-functional DNA."[28] Non-functional DNA is also referred to as "junk DNA."[29] The mitochondrial DNA tests provided by FTDNA are also non-functional DNA tests.[30]

Because non-functional DNA does not contain information that has a measurable effect on human fitness, these tests are not considered medical information by the Food and Drug

---

[22] Greenspan Decl., ¶5.

[23] See Ass'n for Molecular Pathology v. Myriad Gen., Inc., 133 S. Ct. 2107, 2109, 186 L.Ed. 2d 124 (2013) (genetic conditions are contained in exons); Greenspan Decl., ¶3.

[24] Greenspan Decl., ¶3.

[25] Greenspan Decl., ¶3.

[26] Greenspan Decl., ¶3.

[27] Greenspan Decl., ¶3.

[28] Greenspan Decl., ¶6.

[29] Greenspan Decl., ¶6.

[30] Greenspan Decl., ¶6.

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Administration.[31]  The FDA states:

> A genetic test is only subject to FDA oversight if it is a medical device; that is, if it is intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease. For example, a test to determine a person's risk of developing heart disease is a device, whereas a test to determine ancestry is not a device.[32]

FTDNA's tests do not determine the existence or risk of a disease, disorder, trait, propensity, or syndrome.[33]  They are a tool in a genealogist's toolbox, to be combined with historical records, marriage and death records, immigration records, and blood type tests in assessing and determining family lineage.[34]

## C.    Surname project groups are the forum for connections through FTDNA.

The purpose of genetic genealogy is to match, connect, and share results.[35]  Sharing is a critical aspect of this exploration.  Often, key pieces of a person's genealogical jigsaw puzzle are already in another person's collected information.[36]  The value of FTDNA is its forum to share information and compare results – the Surname Project Groups.[37]  These groups, introduced in prior briefing, enable people who have submitted kits to FTDNA for testing to access people who are likely to be related (e.g., because they have a similar surname) in order to compare information and results.[38]  The amount of information a customer chooses to share

---

[31] Greenspan Decl., ¶10, Exh. 1.

[32] Greenspan Decl., ¶10, Exh. 1.

[33] Greenspan Decl., ¶11.

[34] Greenspan Decl., ¶11.

[35] Greenspan Decl., ¶7; Cloud Decl., ¶6.

[36] Cloud Decl., ¶6.

[37] Cloud Decl., ¶6.

[38] Dkt. 106-2, p. 6.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
**Page 6 of 33**

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

is first controlled by whether he/she signs a release, then by whether he/she joins a project, and then by the privacy settings he/she applies.[39]  The information exchange is bilateral.  For example, if Plaintiff wanted to "see" all people potentially related to him, then all people potentially related to him could also "see" him.[40]  Being able to exchange this information helps genealogists learn more about their own family lineages.

### D. Plaintiff accessed the benefit of these connections, but a six-figure damage scheme has given him a case of buyer's remorse.

Plaintiff does not appear to contest that he received the benefit of his bargain in choosing to join the Surname Project Groups.  He connected with several people, including potential family members, and testified that he was excited about the outcome.[41]  He would not have made those connections but for his election to share these results.  Importantly, these connections appear to have been made after he obtained his results, which was after he discovered the posting by Mr. Taylor that is the basis of this suit.[42]  Understanding that people could determine how they were related to him by comparing splices of non-functional DNA, Plaintiff elected to continue down this path.  His lack of concern that people could access and compare his "white noise" is confirmed by his leaving his results on FTDNA (after the "disclosure" and to this day) and by his election to give his login information and results to several other people.[43]  Nor does he claim damages for anything beyond the statutory fines.[44]

---

[39] See Dkt. 106-2, p. 8; Dkt. 106-3, p.2.

[40] Dkt. 106-2, p. 8.

[41] Dkt. 96-1, p. 7.

[42] Dkt. 96-1, p. 9.

[43] Dkt. 96-1, p. 16-18.

[44] Dkt. 96-1, p. 14-16.

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

In short, Plaintiff seeks a windfall for his choice to engage in the public forums Defendant presented to him for the purpose of genealogical research. By choosing to put a splice of his junk DNA results online when joining a Surname project group, he accessed a league of experienced genealogists from a large community that assisted him in developing his own lineage story. They could not have assisted him without having the data that enabled the analysis. Plaintiff embarked on what appears to be the successful start to piecing together his genealogical history. He continues to maintain his account and continues to have his information posted. Yet, now he claims that he wishes the results were not shared - even though he cannot prove they were shared without his permission. Now he seeks punitive fines for the violation of a vaguely defined statute by the single publication of his name and email address without Defendant's approval – even though he cannot prove that his "junk DNA" results were ever accessed.

### III.  ISSUES PRESENTED

1.      Is the Alaska Genetic Privacy Act ("Alaska Statute") unconstitutional when it applies extraordinarily high, one-size-fits-all, statutory damages to punish and deter conduct without considering the reprehensibility of Defendant's actions?

2.      Is the Alaska Statute unconstitutional when it applies punitive damages without clearly defining proscribed behavior or terms such as "informed consent," "genetic information," or "for profit or monetary gain"?

3.      Does the Alaska Statute violate Alaskan law on punitive damages when no factual findings on reprehensibility or ability to pay are required before applying $5,000 or $100,000 fines?

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
**Page 8 of 33**

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

# IV.  EVIDENCE RELIED UPON

This motion is based upon the pleadings and files herein, as well as the Declaration of Bennett Greenspan, with attachment, and the Declaration of Janine Cloud.

# V.  AUTHORITY AND ARGUMENT

## A.  Summary Judgment is appropriate.

Summary Judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of production to show the absence of any genuine issue of material fact.   Fed. R. Civ. P. 56(a).   See also Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) ("The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of fact for trial.").   When, as here, the "nonmoving party has the burden of proof at trial," the moving party can satisfy its initial burden by pointing out that there is an absence of evidence to support the nonmoving party's case. Devereaux, 263 F.3d 1076 (quoting Celotex v. Catrett, 477 U.S. 317, 325 (1986)).  The moving party can also satisfy its initial burden by producing evidence that negates essential elements of the nonmoving party's claims.  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).   In opposing a summary judgment motion, conclusory and speculative testimony is insufficient to raise a genuine issue of material fact, and hearsay evidence is not considered.  Taylor v. Universal Auto Group I, Inc., No. C 13–5245 KLS, 2014 WL 2987395, *2 (W.D.Wash. July 1, 2014).

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

**B.**      **The Alaska Genetic Privacy Act is vague except for its one-size fits all Application of flat dollar fees.**

The Alaska Genetic Privacy Act ("Alaska Statute") is brief and vague. Among other things, it forbids the disclosure of the results of a DNA analysis without informed and written consent. Alaska Statute §18.13.010. "Disclosure" is undefined. "Informed and written consent" is undefined, although the legislature specifically called attention to the advisability of direction for formulation of a definition by regulation of what constitutes "informed consent" to the Alaska Department of Health and Social Services ("Department"). AS 18.13.010(c). The Department has done nothing in the twelve years since passage of the Alaska Statute to provide the public with any regulatory guidance. A "DNA analysis" is defined as "testing to determine the presence or absence of genetic characteristics in an individual." Alaska Statute §18.13.100(2). A "genetic characteristic" is:

> [a] gene, chromosome, or alteration of a gene or chromosome that may be tested to determine the existence or risk of a disease, disorder, trait, propensity, or syndrome, or to identify an individual or a blood relative; [it] does not include family history or a genetically transmitted characteristic whose existence or identity is determined other than through a genetic test.

Alaska Statute §18.13.100(3).[45]

If a disclosure of a genetic characteristic is proven, then:

> [i]n addition to the actual damages suffered by the person, a person violating [the Alaska Statute] shall be liable to the person for damages in the amount of $5,000 or, if the violation resulted in profit or monetary gain to the violator, $100,000.

---

[45] Saved for a later day is the issue of whether this Act even applies to the field of genealogical tests.

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Alaska Statute §18.13.020.  A review of the legislative history of this bill reveals no substantive discussion or findings as to the dollar amounts chosen as fines.  Here, Plaintiff alleges that the disclosure was done for profit, and therefore seeks standing to pursue statutory damages of $100,000 for each of Gene by Gene's over 900 genealogy customers.  If Plaintiff meets his burden to obtain class certification, the potential exposure is over $90 million, an amount that would obliterate Defendant.[46]

The genealogical tests performed by FTDNA are not "to determine the existence or risk of a disease, disorder, trait, propensity, or syndrome."  Thus, the statute will only apply if the tests are "to identify an individual or a blood relative" so long as they are <u>not</u> "family history or a genetically transmitted characteristic whose existence or identity is determined other than through a genetic test."  If genealogical tests, which use DNA results as <u>one</u> of the several tools for gathering data that ultimately is compiled into a family history, somehow fall within the guise of this definition, FTDNA must then surmise what "informed and written consent" and "disclosure" mean.   While it retroactively tries to understand where in this shapeshifting maze of a statute it is allowed to walk, FTDNA faces two equally plausible possibilities – complete dismissal of the suit because it does not apply, or a judgment so large that the company will cease to exist entirely.[47]

**C.**     <u>**The statutory damages sought by Plaintiff are punitive.**</u>

While not explicitly named treble or punitive damages, the statutory fees authorized by Alaska Stat. 18.13.020 are meant to punish and deter behavior and are therefore punitive.  "The

---

[46] Greenspan Decl., ¶13.

[47] Any policy arguments in favor of settlement disappear when facing such divergent odds.

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

measure, not the name, controls." Life & Cas. Ins. Co. of Tenn. v. McCray, 291 U.S. 566, 572–75, 54 S. Ct. 482, 485–86, 78 L. Ed. 987 (1934) ('Penalty' is a term of varying and uncertain meaning. There are penalties recoverable in vindication of the public justice of the state. There are other penalties designed as reparation to sufferers from wrongs.) Damages that are not remedial or compensatory and presuppose a punitive or deterrent purpose are punitive. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416, 123 S. Ct. 1513, 1519, 155 L. Ed. 2d 585 (2003) (collecting cases regarding the purpose of punitive damages); Lyons v. Westinghouse Elec. Corp., 222 F.2d 184, 189 (2d Cir. 1955) (regarding Sherman Anti-Trust statute, which authorizes triple damages for certain plaintiffs upon factual findings – "The remedy provided is not solely civil; two thirds of the recovery is not remedial and inevitably presupposes a punitive purpose. It is like a qui tam action, except that the plaintiff keeps all the penalty.") Punitive or exemplary damages are those awarded in excess of actual loss. Bridges v. Alaska Hous. Auth., 375 P.2d 696, 702 (Alaska 1962).

**D.      The statutory damages sought by Plaintiff are unconstitutionally grossly excessive.**

While punitive damages may be properly imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition, damages that are substantively or procedurally grossly excessive violate the Eighth and Fourteenth Amendments of the U.S. Constitution. Campbell, 538 U.S. at 416; Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 434, 121 S. Ct. 1678, 1687, 149 L. Ed. 2d 674 (2001); BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568, 116 S. Ct. 1589, 1595, 134 L. Ed. 2d 809 (1996). Defendants subject to punitive damages are faced with punitive measures similar to those applied by the criminal system, but have not been accorded the same protection as criminal defendants. Campbell, 538 U.S. at 418. Grossly excessive damages further no

Bullivant|Houser|Bailey PC

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

legitimate purpose and constitute an arbitrary deprivation of property. <u>Campbell</u>, 538 U.S. at 417.

Three elements are considered in assessing whether damages are overly punitive: (1) reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to actual harm suffered, and (3) the sanctions delivered for comparable misconduct. Like criminal findings, the award of punitive damages is subject to de novo review. <u>Cooper</u>, 532 U.S. at 436.

### 1. <u>Providing a forum where people can elect to share data relating to genealogy is not reprehensible behavior.</u>

> Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect "the enormity of his offense." This principle reflects the accepted view that some wrongs are more blameworthy than others. Thus, we have said that "nonviolent crimes are less serious than crimes marked by violence or the threat of violence." Similarly, "trickery and deceit," are more reprehensible than negligence.

<u>Gore</u>, 517 U.S. at 575–76 (internal citations and footnotes omitted).

An analysis of reprehensibility requires a judgment of the moral character of the Defendant's conduct. For example, in <u>Gore</u>, the Court noted that BMW caused only minor economic harm, did not reveal reckless disregard for the safety of others, and was not recidivist in nature. <u>Id.</u> at 576-77. When applying the <u>Gore</u> test in Alaska, the Alaska Supreme Court noted a defendant's "extremely reprehensible" conduct flowing from "intentional malice, trickery, and deceit" in seeking and keeping a $25,000 fee for a service he could not and would not perform. <u>Casciola v. F.S. Air Serv., Inc.</u>, 120 P.3d 1059, 1068 (Alaska 2005).

In <u>Campbell</u>, the Federal Supreme Court condemned the decision by State Farm to intentionally fabricate false evidence, disregard the overwhelming likelihood of an adverse

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
**Page 13 of 33**

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Case 1:14-cv-00004-SLG   Document 109   Filed 11/04/16   Page 13 of 33

judgment and refuse to settle for policy limits, and inform the insured that the insured's assets would be safe in the event of an adverse judgment - then later tell the insureds they would need to sell their house to cover costs. Campbell, 538 U.S. at 419, 432. Here, Defendant Gene by Gene unwittingly stepped into a class action lawsuit when, in the effort to provide Alaskans a framework to connect families and enable people to uncover their personal history, a Group Administrator published Plaintiff's name and email address – without Gene by Gene's knowledge or consent.

The factors of which the Federal and Alaska Supreme Courts direct consideration are:

> the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident

Casciola v. F.S. Air Serv., Inc., 120 P.3d 1059, 1067 (Alaska 2005) (citing Campbell, 538 U.S. at 418(citing Gore, 517 U.S. at 575)). The existence of any one of these factors weighing in favor of Plaintiff may not be sufficient to establish a punitive damages award, and the absence of all of them renders any punitive damages awarded suspect. Campbell, 538 U.S. at 419. The Ninth Circuit provides an example for the analysis of the Campbell factors in the Exxon case. In re Exxon Valdez, 490 F.3d 1066, 1084-89 (9th Cir. 2007), (vacated sub nom. Exxon Shipping Co. v. Baker, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008)).[48] Exxon

---

[48] While the judgment resulting from this opinion was vacated in Exxon v. Baker (cited here and below), the method of analysis performed by the Ninth Circuit was not questioned, merely, it was improper because the events happened in maritime, and not state, jurisdiction. Moreover, the Ninth Circuit has continued to apply this method of analysis for the Campbell factors since the Supreme Court's ruling. See e.g., Arizona v. ASARCO LLC, 773 F.3d 1050, 1054 (9th Cir. 2014).

Bullivant|Houser|Bailey PC

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

addresses punitive damages related to the Exxon-Valdez spill.

> ### *a.* The one-time, temporary publication of a "key" to a door guarding non-functional DNA results did not result in physical or economic harm.

Campbell and Exxon direct consideration of whether harm was physical or economic, with the former tending to weigh against punitive damages. Exxon, 490 F.3d 1085-86. A middle of the road result is applied to conduct that causes emotional as well as economic harm. Id. 1805.

Plaintiff Cole agrees he has not suffered any actual physical or economic harm. As discussed in prior briefing, his alleged harm appears to be several suppositions strung together: (1) Someone may have taken a kit number during the brief time it was online, (2) matched it with results that Plaintiff elected to leave online on a different website, and (3), then somehow discerned from those results "genetic information" as defined by the Alaska Statute.[49] At most, this might be characterized as emotional harm, but damages for emotional harm are typically unavailable in cases devoid of intent, outrage, or – in this case – an actual demonstration that someone accessed Plaintiff's results. See e.g., Restatement (2d) of Torts § 652D (1977) (Cmt a) (Invasion of privacy claim only triggers emotional damages for embarrassment from the release of information highly offensive to a reasonable person that is "certain to become one of public knowledge." In fact, a single "publication" is specifically excluded from the cause of action.); Thomas v. Cleary, 768 P.2d 1090, 1094 (Alaska 1989) (In malpractice claim, accountant's conduct did not reach "the level of outrage" required for emotional damages); Richardson v. Fairbanks North Star Borough, 705 P.2d 454, 456-57 (Alaska

---

[49] See Dkt. 95, p. 3-8.

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1985) (reckless killing of pet animal justifies emotional damages); <u>Croft v. Wicker</u>, 737 P.2d 789, 792-93 (Alaska 1987) (parents may obtain emotional damages for sexual abuse of their daughter where emotional distress of parents was foreseeable). Analysis of this sub-element weighs against a finding of reprehensible behavior.

> ### *b.* The one-time, temporary publication of a "key" to a door guarding non-functional DNA results was not reckless disregard to health or safety.

The Ninth Circuit condemned Exxon's decision to trust an officer "incompetent to command the <u>Exxon Valdez</u>" as "reckless disregard the health and safety of all those in the vicinity." <u>Exxon</u>, 490 F.3d 1086. Here, health and safety are not on the line. While he may argue there is a "risk" that non-functional DNA might cause discrimination or negative insurance effects, Plaintiff has no evidence supporting this position (and testified he suffered no such effects himself). Again, Plaintiff's concern about this "risk" could be eliminated by withdrawing from the Surname Project groups he voluntarily joined. One cannot help but consider the increased risk, if there is one, from Plaintiff's decision to disclose his results to over thirty people, to many of whom he gave his kit passcode and access information. Regardless, this is not a case where a single drunk supertanker driver threatened several lives and devastated an entire economic and environmental region for years. This is a case where Defendant offers a forum for people to choose to share and compare their genetic information. This sub-element weighs heavily against a finding of reprehensible behavior.

> ### c. Plaintiff is not financially vulnerable and was not targeted to be harmed.

"The notion of 'targeting' connotes some element of intent to harm particular individuals or categories of individuals." <u>Exxon</u>, 490 F.3d 1087. In the context of the Exxon-Valdez spill, the Ninth Circuit noted that there was no intent to harm people economically, despite ruinous

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

effect on several members of the fishing industry.  Id.  Thus, in Exxon, the element weighed against punitive damages.  Id.  Here, Plaintiff signed up for the FTDNA kits and bought tests of his own accord.  He was not selected or targeted.  He does not allege economic harm, nor is there evidence of an intent to harm FTDNA customers.  This sub-element also weighs against a finding of reprehensibility.

### d.    Plaintiff's case is unique and not subject to continued repetition.

The Ninth Circuit did not take issue with the trial court's finding regarding the failure, "over and over again," to prevent Captain Hazlewood from captaining a supertanker despite knowing of his alcoholic relapse.  Exxon, 490 F.3d 1088.   Here, in contrast, Defendant has never before faced the Alaska Statute, and prior to this suit, was unaware of the statute.  Moreover, the Plaintiff complains of a "one-time" circumstance that was corrected upon discovery.  This sub-element weighs against a finding of reprehensibility.

### e.    Defendant did not intentionally violate Alaska law or harm Plaintiff with malice.

When considering whether intentional malice or a mere accident occurred, the Ninth Circuit distinguishes between increasingly punishable mind frames and mere negligence or a mere accident as weighing against punitive damages, and intentional malice weighing heavily in favor of punitive damages.  Exxon, 490 F.3d 1088.  In the words of the Court, "Spilling the oil was an accident, but putting a relapsed alcoholic in charge of a supertanker was not.  And anyone doing so would know they were imposing a tremendous risk on a tremendous number of people who could not do anything about it."  Id.   Still, the court noted, "we must acknowledge that Exxon acted with no intentional malice towards the plaintiffs."  Id.  Here, Defendant had no malice toward Plaintiff and is not acting in a manner that promotes wide-

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

spread damage. Instead, Defendant's work promotes wide-spread healing and good.[50] The

sub-element weighs against reprehensibility.

> **f.** **As soon as it learned of Plaintiff's concerns, Defendant attempted to mitigate them.**

While not directly mentioned in <u>Campbell</u>, the Ninth Circuit in <u>Exxon</u> also encourages

a consideration of what was done to mitigate the original misconduct. 490 F.3d 1088. Here,

as soon as Plaintiff reported his concerns to Defendant, steps were taken to remediate the

situation. Complete remediation was accomplished within a month. This sub-element, as all

other sub-elements in this analysis, weighs against reprehensibility.

> **2.** <u>**There is no appropriate ratio of punitive damages for conduct that was not reprehensible and caused no actual damages.**</u>

"The principle that exemplary damages must bear a 'reasonable relationship' to

compensatory damages has a long pedigree." <u>Gore</u>, 517 U.S. at 580. Punitive damage awards

must be tailored to case-specific facts in order to achieve optimal deterrence and punishment

<u>Casciola v. F.S. Air Serv., Inc.</u>, 120 P.3d 1059, 1065 (Alaska 2005). A study of English

common law dating back to 1275 reveals up to quadruple damages for reprehensible behavior.

<u>Id.</u> More than four times the amount of compensatory damages may be "close" to the line of

proper punitive damages, although the idea of a constitutional "bright line" has been explicitly

rejected. <u>Pac. Mut. Life Ins. Co. v. Haslip</u>, 499 U.S. 1, 23, 111 S. Ct. 1032, 1046, 113 L. Ed.

2d 1 (1991). "Few awards exceeding a single-digit ratio between punitive and compensatory

damages, to a significant degree, will satisfy due process." <u>Campbell</u>, 538 U.S. at 425. There

is a sliding scale between the egregiousness of a defendant's behavior and the acceptable ratio

---

[50] Greenspan Decl., ¶8-9; Cloud Decl., ¶6.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
**Page 18 of 33**

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Case 1:14-cv-00004-SLG   Document 109   Filed 11/04/16   Page 18 of 33

of compensatory damages to punitive damages.  Gore, 517 U.S. at 582; Casicola, 120 P.3d at 1068.  For example, while State Farm's behavior in Campbell deserved punitive damages, a multiplier of 145 times the compensatory damages awarded was excessive.  Campbell, 538 U.S. at 425-26.  Ultimately, a general concern of reasonableness should enter into the calculus. Haslip, 499 U.S. at 18.

More recently, the Federal Supreme Court has examined data relating to punitive damages and strengthened its stance regarding the appropriate ratio of punitive damages:

> Although some studies show the dollar amounts of awards growing over time, even in real terms, most accounts show that the median ratio of punitive to compensatory awards remains less than 1:1. Nor do the data show a marked increase in the percentage of cases with punitive awards. The real problem is the stark unpredictability of punitive awards. Courts are concerned with fairness as consistency, and the available data suggest that the spread between high and low individual awards is unacceptable. The spread in state civil trials is great, and the outlier cases subject defendants to punitive damages that dwarf the corresponding compensatories. The distribution of judge-assessed awards is narrower, but still remarkable. These ranges might be acceptable if they resulted from efforts to reach a generally accepted optimal level of penalty and deterrence in cases involving a wide range of circumstances, but anecdotal evidence suggests that is not the case.

Exxon Shipping Co. v. Baker, 554 U.S. 471, 128 S. Ct. 2605, 2609–10, 171 L. Ed. 2d 570 (2008) (citing Gore, 517 U.S. at 565).  The Court further noted that the upper limit of a multiplier should be a case involving malicious behavior and dangerous activity.  Id. at 510. Indeed, in the case of the Exxon-Valdez spill, which resulted in long-standing damage because of the "worse than negligent but less than malicious" tort committed when a known alcoholic captain with a BAC of .241 crashed a ship into a reef, even a 2:1 ratio was too high.  Id. at 511-12.  That Court eventually awarded a 1:1 punitive damages ratio.  Id. at 515.

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

What is particularly striking about the Alaska Statute is that, contrary to federal and state law, compensatory damage and malfeasance do not even come into the equation. If the statute is applied to Defendant as Plaintiff seeks, Defendant faces the same damages for unintentionally violating the statute by not preventing a volunteer group administrator to post Plaintiff's name and kit number, which may or may not have been used to access "junk DNA" (data irrelevant to human fitness) posted on Defendant's website – data that had been posted by Defendant to connect customers genealogically. Such an application would make no differentiation between Defendant's alleged actions and those of a malicious miscreant who intentionally publishes someone's genetic results, revealing a predisposition for sickle cell anemia, in order to cause stigma. This outcome directly contradicts the value placed by the state and federal supreme courts in tailoring punitive damages to a defendant's conduct. There is no accord for the amount of damage done to the tort victim and no consideration of where on the sliding scale of reprehensible-behavior-to-damages-paid that ratio should fall. Rather, here, where Plaintiff asserts no harm or compensatory damages aside from entitlement to punitive damages under the statute, the ratio is infinite and therefore unconstitutional.

**3.  Statutes and case law on similar topics reveal the punishments contemplated in this statute are excessive.**

The third indicia for excessiveness is a comparison to other statutory fines in the same or an alternative jurisdictions for "similar malfeasance." <u>Gore</u>, 517 U.S. at 583-84.

### *a.*  **Comparable Alaska Statutes**

Cases collected by the Alaska Supreme Court reveal that, at common law, behavior needs to reach a particularly egregious level of malfeasance before damages skyrocket:

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
**Page 20 of 33**

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Case 1:14-cv-00004-SLG   Document 109   Filed 11/04/16   Page 20 of 33

> Cent. Bering Sea Fishermen's Ass'n v. Anderson, 54 P.3d 271, 274–77 (Alaska 2002) (approving $600,000 in total punitive damages and $48,000 in compensatory damages for constructive termination and defamation); Laidlaw Transit, Inc. v. Crouse ex rel. Crouse, 53 P.3d 1093, 1096–97 (Alaska 2002) (approving $500,000 in punitive damages and $19,259 in compensatory damages against school bus company that employed drug-using driver); Era Aviation, Inc. v. Lindfors, 17 P.3d 40, 43, 49 (Alaska 2000) (ordering $725,000 punitive award remitted to $500,000 where compensatory damages for emotional distress equaled $50,000); IBEW, Local 1547 v. Alaska Utility Constr. Inc., 976 P.2d 852, 853–55 (Alaska 1999) (affirming $212,500 punitive award against union that engaged in "outrageous" picketing behavior where compensatory damages totaled $11,622.05); Norcon, Inc. v. Kotowski, 971 P.2d 158, 161, 174–77 (Alaska 1999) (ordering $3,000,000 punitive award remitted to $500,000 where compensatory damages totaled slightly more than $10,000 in sexual harassment suit).

Casciola v. F.S. Air Serv., Inc., 120 P.3d 1059, 1065 (Alaska 2005).

Even somewhat similar Alaska Statutes do not carry similar punitive weight. When class actions are filed for consumer protection violations, only three times the amount of actual damages or $500 (whichever is greater) is authorized. Alaska Stat. § 45.50.531. In the case of the intentional falsification or forgery of an individual's advance health care directive, $10,000 or actual damages is authorized. Alaska Stat. Ann. § 13.52.090. A survey of other punitive or statutory damages available in Alaska do not analogize to this case.

Considering what behavior Alaska finds "condemnable enough" for a $100,000 or $5,000 damage award is also instructive. The only other Alaska Statutes uncovered by the defense authorizing $100,000 in any sort of statutory damages, fees, or fines are two relating to major pollution issues: Alaska Stat. Ann. § 46.03.760 (maximum $100,000 civil penalty for pollution (capped at $5,000 per day), and Alaska Stat. Ann. § 31.05.150 (maximum $100,000 initial penalty for violation of the Alaska Oil and Gas Conservation Act.) In both statutes, the

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

penalty is paid to the government, not a private claimant, and the penalty is <u>capped</u> at $100,000, not a flat fee. In addition, the context of these statutes involve wide-ranging damage to ecosystems from pollution and oil spills.

The only other Alaska Statutes uncovered by the defense authorizing $5,000 in any sort of statutory damages, fees, or fines were:

- Alaska Stat. Ann. § 18.60.095: Minimum penalty of $5,000 for the <u>willful</u> creation of an unsafe workplace;

- Alaska Stat. Ann. § 09.50.020: $5,000 criminal penalty, upon conviction, for criminal contempt;

- Alaska Stat. Ann. § 28.35.032: $5,000 criminal penalty, upon conviction, for alcohol-related traffic crime;

- Alaska Stat. Ann. § 16.05.407: Maximum $5,000 penalty, upon conviction, for violation of big game hunting statute;

- Alaska Stat. Ann. § 21.59.200: Maximum criminal penalty, upon conviction, of each knowing violation of motor vehicle safe repair contract laws (but the aggregate total cannot exceed $50,000);

- Alaska Stat. Ann. § 46.03.760: Maximum $5,000 per day civil penalty for pollution (capped at $100,000);

- Alaska Stat. Ann. § 10.50.870: Maximum $5,000 fine for an LLC's refusal to make its books available for inspection;

- Alaska Stat. Ann. § 10.06.430: Maximum $5,000 fine for a corporation's refusal to make its books available for inspection; and

- Alaska Stat. Ann. § 45.48.200: Civil punitive damages of between $100 and $5,000 for each knowing violation of state credit reporting act, as deemed appropriate by the court.

In all the above statutes, the penalty is <u>capped</u> at $5,000 per violation and is not a flat

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
**Page 22 of 33**

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Case 1:14-cv-00004-SLG   Document 109   Filed 11/04/16   Page 22 of 33

fee. In all the above statutes, a criminal conviction and/or intentional/knowing violation of the statute is required.

In sum, statutes with comparable dollar fines demonstrate the values Alaska chooses to protect (and the violations of which it will punish): widespread injuries to its land, drunk driving, a willful disregard of motor vehicle or workplace safety, and refusal to cooperate with auditing procedures. These are not issues at play here. More importantly, <u>every single one of these statutes tailors the damage, penalty, or fee to the specific facts of the case</u>. The statute at issue in this case does not. This sub-element favors a finding that the statute is excessively punitive because it does not correlate to local practice and punishment.

### b. Comparable Genetic Privacy Act Statutes.

<u>Gore</u> also relied upon a comparison of statutes from other jurisdictions regarding similar malfeasance. <u>Gore</u>, 517 U.S. at 583-84. An examination of similar genetic privacy acts is also instructive. Here is what a survey by Defendant reveals:

- California: For a willful disclosure of genetic information by insurance professionals, there is a civil penalty of $1,000 - $5,000. Cal. Ins. Code. § 10149.10. For a willful or negligent disclosure of…by insurance professionals that results in economic, bodily, or emotional harm to the subject of the test, upon conviction of a criminal misdemeanor, an up to $10,000 fine and/or up to one year imprisonment as punishment may be applied. <u>Id.</u> For a negligent disclosure by any person, up to $1,000 in fines may be applied. Cal. Civ. Code. § 56.17. For a willful disclosure by any person, civil penalty of $1,000 - $5,000 may be applied. <u>Id.</u> For a willful or negligent disclosure that results in economic, bodily, or emotional harm to the subject of the test, upon criminal conviction, up to $10,000 and/or up to one year imprisonment as punishment will be applied. <u>Id.</u> Unlike the Alaska Statute,

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
**Page 23 of 33**

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Case 1:14-cv-00004-SLG   Document 109   Filed 11/04/16   Page 23 of 33

California clearly defines what is necessary for informed written consent. Cal. Civ. Code. § 56.17(g). California limits the scope of these statutes to genetic results contained in medical records or insurance applications. Cal. Civ. Code. § 56.17(a)

- Colorado:  The greater of $10,000 or actual damages is available in private suit. Colo. Rev. Stat. § 10-3-1104.6.

- Delaware:  $5,000 to $50,000 for the non-anonymous disclosure of genetic information. 16 Del. Code § 1201, 1227.  However, the definition of "genetic test" in Delaware does not encompass genetic genealogy.  Id.  Delaware does define "informed consent." 16 Del. Code § 1201.

- Nevada:  Actual damages only.  A criminal misdemeanor charge is also possible. Nev. Rev. Stat. 629.191, 629.201. The definition of "genetic test" in Nevada does not encompass genetic genealogy.  Nev. Rev. Stat. 629.121. Unlike the Alaska Statute, Nevada required the Board of Health to develop an informed consent standard.  Nev. Rev. Stat. 629.181.

- New Hampshire:  $1,000 authorized in special or general damages. N.H. Rev. Stat. § 141-H:6.

- New Jersey:  $1,000 fine or 6 months in prison for a violation, $5,000 or one year of prison for a willful violation. N.J. Stat. 10:5-49. Unlike the Alaska Statute, New Jersey required the Commissioner of Health to develop an informed consent standard.  N.J. Stat. 10:5-45.

- New Mexico:  Up to $5,000 for a willful or grossly negligent violation.  The definition of "genetic analysis" in New Mexico does not encompass genetic genealogy. N.M. Statute § 24-21-2(C).

- New York:  Up to $1,000 fine per violation, up to $5,000 fine or 90 days imprisonment for willful violation. N.Y. Civ. Rts. § 79-l.  Genetic genealogy is not

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
Page 24 of 33

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Case 1:14-cv-00004-SLG   Document 109   Filed 11/04/16   Page 24 of 33

encompassed by New York's genetic privacy statute. N.Y. Civ. Rts. § 79-l.  New York also explicitly defines informed consent.  Id.

Analyzing statutes from other states, fines are typically lower, are never fixed at a set rate (although may be fixed to a set range), and often require a willful or reckless mens rea before increasing.  They do not allow for an infinite multiplier on actual damages and do not provide for a skyrocket of 2000 percent merely if "profit or monetary gain" (which also is not defined)[51] occur.  Furthermore, many of those states do not apply fines to genetic genealogy.

Finally, disclosure of private information cases typically require malice or outrage for punitive damages to be applied.  Vassiliades v. Garfinckel's, Brooks Bros., 492 A.2d 580, 594 (D.C. App., 1985) (punitive damages not permitted in case were plastic surgeon publicized "before" and "after" photos of patient without consent in a public presentation because there was no evidence that the behavior was outrageous or reckless);  Davis v. Creditors Interchange Receivable Mgmt., LLC, 585 F. Supp. 2d 968, 977 (N.D. Ohio 2008) (requiring, as needed under Ohio law, "malice" or a mindset characterized by "hatred, ill will or a spirit of revenge," no specific finding on damages);  Nolley v. County of Erie, 802 F. Supp. 898, 903, 905 (W.D.N.Y 1992) (applying the §1983 standard which requires "evil motive or intent" or "reckless or callous indifference to federally protected rights of others," $20,000 awarded.) Some courts also hold that if compensatory damages are unavailable in a disclosure of private information case, punitive damages are inappropriate.  Rohrbaugh v. Wal-Mart Stores, Inc., 212 W.Va. 358, 363, 572 S.E.2d 881, 887 (Wis. App., 1987).

The survey of both Alaskan and alternative jurisdictions' treatment of similar

---

[51] See Alaska Stat. 18.13.020.

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

"malfeasance" confirms that the damages in the Alaska Statute are unconstitutionally excessive.

**E.    The statutory damages sought by Plaintiff are punishment for an unconstitutionally vague statute.**

In addition to the understanding of the severity that a punishment may impose, it is imperative that a tortfeasor know what conduct will subject him to this punishment.  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 417, 123 S. Ct. 1513, 1520, 155 L. Ed. 2d 585 (2003); BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574, 116 S. Ct. 1589, 1598, 134 L. Ed. 2d 809 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice []of the conduct that will subject him to punishment.")  Punitive damages are specifically designed to exact punishment in excess of actual harm to make clear that the defendant's misconduct was especially reprehensible. Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 432, 121 S. Ct. 1678, 1683, 149 L. Ed. 2d 674 (2001).  Where civil penalties are alleged, protections against "judgment without notice" is implicated.  Gore, 517 U.S. at 574 (citing several Supreme Court cases addressing ex post facto interpretations of criminal statutes as a violation of the Eighth and Fourteenth Amendments).

Separately, the Fourteenth Amendment is violated by laws "so vague that persons of common intelligence must necessarily guess at their meaning and differ as to their application." Tucson Woman's Clinic v. Eden, 379 F.3d 531, 554 (9th Cir. 2004).  "A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." Connally v. Gen. Const. Co., 269 U.S. 385, 391, 46 S.

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Ct. 126, 127, 70 L. Ed. 322 (1926); see also Hill v. Colorado, 530 U.S. 703, 732, 120 S. Ct. 2480, 2498, 147 L. Ed. 2d 597 (2000).

Here, the statute contains multiple undefined terms that, depending on how they are construed, could make or break Plaintiff's case (and, correspondingly, condemn Defendant to bankruptcy). Here are the multiple vague definitions that must be plowed through and applied, ex post facto, to Defendant's behavior for Plaintiff to succeed:

- "Genetic information": While defined, the portion that may apply to Plaintiff is contradictory. One must determine where the line falls between a test "to identify an individual or a blood relative," which is considered genetic information, and a test for "family history or a genetically transmitted characteristic whose existence or identity is determined other than through a genetic test," which is not.

- "Disclosure": This is undefined. Is a single disclosure a "publication" in the sense of an act for libel? Or is it a widespread publication, such as in the public disclosure of information? Because "disclosure" often includes a finding of intent, or express endorsement by an agent's superior, did the legislature mean to include such a finding here?

- "Informed and written consent": What is sufficient to meet this standard? Does the phrasing "informed and written consent" differentiate this definition from standards relating to "informed written consent"? Importantly, the Alaska legislature recognized the need for further clarity and notice to the public on this topic but, inexplicably, the Department has done nothing in twelve years to amplify and explain these vague definitions to provide some guidance to the public as to what is required.

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

- "<u>Person</u>": Who is a "person" under the statute? Do typical rules of agency apply? If an entity discloses information to its agent, is that considered a disclosure to a new "person", or is it considered a viewing by the "same" person?

- "<u>Resulted in profit or monetary gain</u>": What is "profit"? What is "monetary gain"? What needs to "result in profit"? Plaintiff seems to believe that anything done in the course of business would result in profit. Does Plaintiff need to demonstrate that the particular disclosure itself resulted in profit?

- "<u>Profit or monetary gain to the violator</u>": If the violator is different than the entity sued, who needs to "profit"? Again, do rules of agency apply?

While the vagueness of a law may be a permissible risk to citizens facing compensatory contract or negligence damages, it is axiomatic that punishment and example-making is reserved for those who chose to violate clearly condemned behavior, especially in cases where, as here, the <u>only sought are</u> the statutory damages meant to punish and deter.

The Alaska Supreme Court has also analyzed the restrictions the Fourteenth Amendment places on overly vague laws. <u>State v. O'Neill Investigations, Inc.</u>, 609 P.2d 520, 531-32 (Alaska 1980) (quoting <u>Connally</u>, <u>supra</u>). In that case, the Court specifically commented on the importance of "infus[ion]" of vague terms with agency and judicial interpretation of the statute, and by considering the legislative intent in creation of a phrase. <u>Id.</u> In that case, the legislature specifically intended that the phrase "unfair practices" be vague because "there is no limit to human inventiveness in [that] field." <u>Id.</u> at 533. Here, as demonstrated in the Motion to Dismiss pending before this Court, the legislature was specifically concerned with issues unrelated to genealogy, and instead focused on

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

discrimination, employment, and insurance practices.[52]  Legislators also specifically discussed the need to clarify the intent because of the fast-developing field of genetics.[53]  More importantly, there was no discussion of the meaning of "informed and written consent" – this was not left intentionally vague, nor should it have been, as it was precisely the mechanism of enabling safe harbor from the punishment of this statute.

The differences between O'Neill and this case continue.  That Court specifically commented on the state's failure to adopt regulations supplementing Alaska's version of a federal statute, noting that any "defects in the constitutional sufficiency" of a statute are cured by administrative regulations that clarify or resolve ambiguity.  Id. at 534.  In O'Neill, the failure to adopt regulations was cured by mirroring federal regulations, which put the Defendant on notice for proper behavior.  Unfortunately, here, despite the more than 12 years since the Alaska Statute's passage, the Department has not followed the legislature's directive to fill in those gaps.  No federal regulations resolve this – in fact, the FDA has indicated genealogical tests are outside the ambit of its regulation.  Thus, not only does this Defendant and the Court lack guidance from the state legislature on the interpretation of this statute's vague terms, they also are unaided by the regulations contemplated by the legislature as an assistive device.  Moreover, had regulations been drafted and proposed, they would have triggered definition-vetting and clarification by the public, industry participants, and citizen groups through notice and comment procedures.  In sum, even the legislature seemed to acknowledge the vagueness and need for detail in the statute it was passing.  It does not pass constitutional muster.

---

[52] Dkt. 95, p.14-16.

[53] Dkt. 95, p.14-16.

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

**F.**    **The statutory damages sought by Plaintiff violate Alaska's punitive damages statute.**

The Alaska Supreme Court treats separately the issue of whether a punitive damages scheme violates Alaskan law. Under Alaskan law, punitive damages can only be imposed upon specific findings by clear and convincing evidence. Alaska Stat. Ann. § 09.17.020. Punitive damages are disfavored and allowed only within narrow limits. VECO, Inc. v. Rosebrock, 970 P.2d 906, 924 (Alaska 1999).[54]  Plaintiff must establish, at a minimum, conduct that amounts to "reckless indifference to the rights of others, and conscious action in deliberate disregard of those rights." Chizmar v. Mackie, 896 P.2d 196, 210 (Alaska 1995). This includes an understanding of what behavior is condemned as illegal. See Sturm, Ruger & Co. v. Day, 594 P.2d 38, 46 (Alaska 1979), modified, 615 P.2d 621 (Alaska 1980), on reh'g, 627 P.2d 204 (Alaska 1981) (overruled on other grounds by Dura Corp. v. Harned, 703 P.2d 396 (Alaska 1985)) (gun manufacturer who understood liability applied to product defects, and understood its product was defective in a fatal manner, could not assert a void-for-vagueness challenge). Punitive damages should not be an automatic award in strict liability cases, but should consider the behavior of the wrongdoer. Id.

The Alaska Supreme Court disfavors fixed-rate punitive damages, noting that they are better tailored to case-specific facts in order to achieve optimal deterrence and punishment. Casciola, 120 P.3d at 1065; Norcon, Inc. v. Kotowski, 971 P.2d 158, 179 (Alaska 1999). Alaska Statute 9.17.020 identifies that specific factors that must be accounted for in issuing punitive damages:

---

[54] Punitive damages alone cannot be awarded where compensatory damages are not. Deland v. Old Republic Life Ins. Co., 758 F.2d 1331, 1338 (9th Cir. 1985).

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

(1) the likelihood at the time of the conduct that serious harm would arise from the defendant's conduct;

(2) the degree of the defendant's awareness of the likelihood described in (1) of this subsection;

(3) the amount of financial gain the defendant gained or expected to gain as a result of the defendant's conduct;

(4) the duration of the conduct and any intentional concealment of the conduct;

(5) the attitude and conduct of the defendant upon discovery of the conduct;

(6) the financial condition of the defendant; and

(7) the total deterrence of other damages and punishment imposed on the defendant as a result of the conduct, including compensatory and punitive damages awards to persons in situations similar to those of the plaintiff and the severity of the criminal penalties to which the defendant has been or may be subjected.

Alaska Stat. Ann. § 09.17.020 (West)

There is no evidence that the legislature even considered these elements in formulating its one-size-fits-all $100,000 fine. Requiring a non-compensatory fine meant to punish Defendant for its behavior, and to discourage similar behavior from others, is an application of punitive damages in violation of this statute. Therefore, the damages sections of this statute cannot be enforced.

## VI.  CONCLUSION

Plaintiff concedes he has no evidence of actual damages and seeks only statutory damages under the Alaska Statute. Yet these damages are unconstitutional and violate state and federal law because they are overly punitive and punish behavior that is not clearly forbidden. They also are unconstitutional and violate federal and state law because the proscribed behavior is too vague for a person to be on notice of what behavior is condemned.

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Because Plaintiff's theory of damages is not legally viable, Defendant Gene By Gene respectfully requests that this Court grant summary judgment dismissal with prejudice of Plaintiff's claims.

DATED:  November 4, 2016

BULLIVANT HOUSER BAILEY PC

By    /s/ Holly D. Brauchli
     Matthew R. Wojcik, ABA 0710071
     E. Pennock Gheen, *Pro Hac Vice*
     Holly D. Brauchli, *Pro Hac Vice*
     Telephone:  206.292.8930

     Timothy Petumenos, ABA 7611147
     Law Office of Tim Petumenos, LLC
     Telephone: 907-276-2676
     Attorneys for Defendant

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
**Page 32 of 33**

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Case 1:14-cv-00004-SLG   Document 109   Filed 11/04/16   Page 32 of 33

# CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2016, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

persons listed below:

Jay Edelson
Rafey S. Balabanian
Benjamin H. Richman
J. Dominick Larry
David I. Mindell
Courtney C. Booth
Edelson PC
350 North LaSalle Street, Suite 1300
Chicago, IL  60654
jedelson@edelson.com
rbalabanian@edelson.com
brichman@edelson.com
nlarry@edelson.com
dmindell@edelson.com
cbooth@edelson.com
Attorneys for Plaintiff

Timothy J. Petumenos
Law Offices of Tim Petumenos, LLC
1227 W. 9th Ave., Suite 301
Anchorage, AK  99501
timp@tpaklaw.com
Attorneys for Defendant

Douglas K. Mertz
319 Seward Street, Suite 5
Juneau, Alaska 99801
dkmertz@ak.net
Attorneys for Plaintiff

/s/ Holly D. Brauchli
Holly D. Brauchli

4839-5045-8427.1

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
**Page 33 of 33**

**Bullivant|Houser|Bailey PC**

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930